## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

STACEY E. RHOADS and           )
MARGARET M. GIBNEY             )
                               )
    Plaintiffs,                )
                               )
    v.                         )        CAUSE NO.: 3:11-CV-366-TLS
                               )
RIETH-RILEY CONSTRUCTION CO.,  )
INC.,                          )
                               )
    Defendant.                 )

## OPINION AND ORDER

Plaintiffs Stacey Rhoads and Margaret Gibney worked for Defendant Rieth-Riley Construction Co., Inc., as Quality Control Technicians. After they quit their jobs, they sued Rieth-Riley for sexual harassment and gender discrimination under Title VII of the Civil Rights Act of 1964, as amended, based on the actions of their supervisor, Oleg Borodkin. Plaintiff Rhoads also alleged that Reith-Riley engaged in retaliatory behavior against her after she complained of Borodkin's mistreatment. This matter is before the Court on Defendant Rieth-Riley Construction Co., Inc.'s Motion for Summary Judgment [ECF No. 23], the Plaintiff's Objection to Defendant Rieth-Riley Construction Co. Inc.'s Motion for Summary Judgment [ECF No. 27], Defendant Rieth-Riley Construction Co., Inc.'s Reply in Support of Motion for Summary Judgment [ECF No. 29], the parties' briefs, and the supporting exhibits.

## SUMMARY JUDGMENT STANDARD

The standards applicable to summary judgment are well established. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment

is the moment in litigation where the non-moving party is required to marshal and present the
court with evidence on which a reasonable jury could rely to find in her favor. *Goodman v. Nat'l
Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). The party seeking summary judgment bears
the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett*,
477 U.S. 317, 323 (1986); *see also* N.D. Ind. L.R. 56-1(a) (stating that the movant must provide
a "'Statement of Material Facts' that identifies the facts that the moving party contends are not
genuinely disputed"). In response, the nonmoving party cannot rest on bare pleadings alone but
must use the evidentiary tools listed in Rule 56 to designate specific material facts showing that
there is a genuine issue for trial. *Celotex*, 477 U.S. at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d
596, 598 (7th Cir. 2000); N.D. Ind. L.R. 56-1(b) (directing that a response in opposition to a
motion for summary judgment must include "a section labeled 'Statement of Genuine Disputes'
that identifies the material facts that the party contends are genuinely disputed so as to make a
trial necessary"). According to Rule 56:

> A party asserting that a fact cannot be or is genuinely disputed must support the
> assertion by:
> (A) citing to particular parts of materials in the record, including depositions,
> documents, electronically stored information, affidavits or declarations, stipulations
> (including those made for purposes of the motion only), admissions, interrogatory
> answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a
> genuine dispute, or that an adverse party cannot produce admissible evidence to
> support the fact.

Fed. R. Civ. P. 56(c)(1). Additionally, as set forth in Rule 56(e):

> If a party fails to properly support an assertion of fact or fails to properly address
> another party's assertion of fact . . . , the court may:
> (1) give an opportunity to properly support or address the fact;
> (2) consider the fact undisputed for purposes of the motion;
> (3) grant summary judgment if the motion and supporting materials—including the
> facts considered undisputed—show that the movant is entitled to it; or

2

(4) issue any other appropriate order.

Fed. R. Civ. P. 56(e)(1)–(4).

Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, the court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *see Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (noting the often stated proposition that "summary judgment cannot be used to resolve swearing contests between litigants"). A material fact must be outcome determinative under the governing law. *Insola*, 216 F.3d at 598–99. "Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute." *Harney v. Speedway SuperAmerica, LLC,* 526 F.3d 1099, 1104 (7th Cir. 2008).

## STATEMENT OF FACTS

The following facts are supported by citations to admissible materials in the record:

### A.    Rieth-Riley Construction Company

Rieth-Riley is in the road construction business. It produces and lays asphalt and concrete for highway, commercial, and bridge projects. Rieth-Riley mixes its products using a variety of liquids and aggregate materials, such as gravel, sand, and crushed rock. The materials used are dependent upon customer requirements and performance expectations of the finished product. Quality Control Technicians (QC Techs) design, monitor, and test the mixtures to ensure they meet customer specifications. Rieth-Riley has laboratories where QT Techs monitor quality

control in South Bend and Elkhart, Indiana.

The Indiana Department of Transportation (INDOT) is one of Rieth-Riley's biggest customers. INDOT requires all of its contractors, including Rieth-Riley, to perform specific tests on the materials used to create asphalt mixes, as well as on the completed mixes, to ensure they meet INDOT's requirements. INDOT mandates test frequency and requires contractors to certify compliance. INDOT audits its contractors, and failure to comply with INDOT's testing and certification requirements can result in penalties, including monetary fines and loss of contracts. Because INDOT is such a large customer for Rieth-Riley, being barred from performing INDOT work would have a significant economic impact on Rieth-Riley.

**B.      Margaret Gibney's Employment**

1.      Gibney's Employment: 2006–2009

On April 21, 2006, Gibney began working as a QC Tech in Rieth-Riley's South Bend QC lab. She had no experience as a QC Tech before joining Rieth-Riley. When she was hired, Gibney reported to John Berscheit, the Quality Supervisor. In November 2006, one of the South Bend QC Techs who Gibney worked with, Oleg Borodkin, became the supervisor of the South Bend lab.

According to Borodkin's evaluations of Gibney, she exhibited deficiencies in her ability to properly perform quality control tests, to understand the significance and ramifications of such tests, to retain information regarding how to perform such tests, and to use critical thinking to analyze test results. He recorded these shortcomings in performance evaluations completed in 2007, 2008, and twice in 2009. During these evaluations, he also noted the positive aspects of

Gibney's performance. Despite these deficiencies, Gibney did not have any complaints about her job and got along well with her co-workers and with Borodkin. She did not have any complaints about the manner in which Borodkin treated her through the end of 2009.[1]

2.      Gibney's Claims About the Work Environment After 2009

In late 2009, Borodkin became the supervisor for both the South Bend and Elkhart labs and moved his office to Elkhart. Because Gibney was the senior technician in the South Bend lab, she was given additional responsibilities. In January 2010, Rieth-Riley hired John Erickson to work as a QC Tech, and in May 2010 hired Justin Pyle as a QC Tech. Gibney, Pyle, and Erickson were the QC Techs in the South Bend lab. Gibney believes the atmosphere of the lab changed when Rieth-Riley hired Erickson and Pyle. Specifically, that Borodkin admonished her in front of the other employees, that two or three times Borodkin took the male employees to lunch without her, that Borodkin would invite the other male employees into the yard or the back room for conversations that she was not asked to participate in, and that Bodorkin told her that he did not think women should work, but needed to stay home and have babies.

3.      INDOT Audit

On August 17, 2010, INDOT audited Rieth-Riley. Because Gibney was the senior

---

[1] Gibney did have conversations with Borodkin that she described as religious, in which Borodkin would express ideas contrary to her views about the roles of women in the workplace and at home. Borodkin believed that it was biblical for women to take care of the children and for men to be the family providers. Gibney did not believe that these conversations were harassing or discriminatory. (Gibney Dep. 39–40, 69, ECF No. 24-5.)

technician in South Bend, Borodkin assigned her the responsibility to gather and assemble all the information necessary for the audit in South Bend. As a result of the audit, INDOT placed Rieth-Riley on a one-year probation. Probation resulted, in part, because INDOT discovered that Rieth-Riley had not complied with its Type D certification requirements, which require that for every 600 tons of asphalt produced the producer perform a test and certify its results. Rieth-Riley had only 70 certified test results for 60,000 tons of asphalt, when it should have had 100 certificates. Gibney was responsible for meeting the Type D certification requirements and had received training from INDOT on the certification process. However, Gibney understood from a conversation with Borodkin that even when more than 600 tons were produced and sent out in different trucks, if all the trucks carried the same mix she could use one truck sample to cover each truck that carried this same mix. She following Borodkin's instructions as she understood them, leading to the shortage of tests and certificates.

During the audit, INDOT inspectors also looked at Excel spreadsheets documenting the asphalt test results that Rieth-Riley was required to perform. All the QC Techs performed these tests, which they recorded in writing. Gibney was then responsible for entering the test data into Excel and for maintaining the spreadsheets. Borodkin had completed this task in previous years. When the spreadsheets were presented to INDOT, it became obvious that much of the information had been incorrectly entered. The next day, Borodkin sat down with Gibney to correct the errors. Borodkin had collected the paper test results and compared those with the data that had been entered into Excel. He then began the process of working with Gibney to re-enter the test results so the spreadsheets would be accurate. As Borodkin watched Gibney enter the results, he made comments that she considered derogatory, such as, "'you didn't do that right,'

6

'what are you doing,' 'how come you did that,' 'what are you doing." (Gibney Dep. 83, ECF No. 24-5.) After two hours Gibney became angry and walked out, stating, "I can't do this anymore. I got to go." (*Id.*) Borodkin informed her that she was being insubordinate by leaving before the job was done, but she left anyway. Borodkin worked until late in the evening to correct the errors. When Gibney later apologized to Borodkin for her outburst, explaining that she did not care for the way he had talked to her and noting that he did not talk to the other technicians that way, he told her to "quit being a victim." (*Id.* 84.)


4.      Other Employment Issues

Gibney was responsible for pulling samples of sand and gravel from the South Bend yard for testing. Only employees who were certified by the Certified Aggregate Producer Program (CAPP) were allowed to retrieve aggregate samples for testing. Gibney allowed Rieth-Riley employee Rex Ott to pull samples from the yard even though he was not CAAP certified, as this was the practice in place when she began her employment with Rieth-Riley under the supervision of Berscheit. Borodkin told Gibney, in the presence of Berscheit, that she could no longer use Ott to pull samples because he was not CAPP certified. Later, Gibney suggested to Berscheit that Rieth-Riley should just get Ott certified. Gibney maintains that when Borodkin found out about the comment, he got angry. Even though Borodkin directed Gibney to stop the practice of using Ott to pull samples, Gibney again used Ott to gather a sample.

In November 2010, Gibney was involved in an incident with INDOT regarding a Saturday paving job. On the Friday preceding the planned Saturday paving, Rieth-Riley produced 300 tons of hot mix asphalt and stored it in a silo. While making the hot asphalt, Rieth-

Riley ran out of the performance graded liquid (PGL) necessary for the production of the asphalt for the Saturday job, and stopped production. On Saturday morning a tanker containing PGL arrived, but it was not the PGL required for the Saturday job. The plant operator called Gibney at home and told her he needed to make more mix, but they had received the wrong PGL. Gibney called INDOT to clarify whether the PGL they received could be used. During her phone call, Gibney told the INDOT representative that Rieth-Riley had paved on Saturday without clarifying that Rieth-Riley had done so using the Friday mixture, which contained the correct PGL. As a result, INDOT believed that Rieth-Riley had used the incorrect PGL in its mixture and paving, and it fined Rieth-Riley $18,000. The fine was later rescinded when the ambiguity in Gibney's communication was identified.

In another incident, an INDOT geologist was scheduled to come to Rieth-Riley's South Bend location to perform quality samples on Rieth-Riley's #53 Gravel. Borodkin told Gibney to help the geologist find the correct gravel for sampling. When the geologist arrived, Gibney asked him if he needed her to go out to the yard with him, and the geologist assured her that he knew where the #53 Gravel was located. The geologist collected the wrong sample, leading INDOT to question the gravel's properties. Additionally, when Borodkin asked Gibney if Rieth-Riley's samples of #53 Gravel were passing specification, she responded that they were. When he asked for more detailed information regarding the tests, Gibney admitted that the tests had not been completed.[2]

---

[2] Gibney complains that this assertion is supported only by Borodkin's statement. Gibney, however, does not identify the defect in Bodorkin's statement, which he provides in a declaration signed under the penalty of perjury. (Borodkin Decl. ¶¶ 54, 55.) As a participant in the conversation at issue, he is speaking about matters within his "personal knowledge." *See* Fed. R. Civ. P. 56(c)(4) (providing that a declaration used to support a motion for summary judgment "must be made on personal knowledge"). Gibney has not presented any admissible evidence of her own to genuinely dispute Borodkin's statement.

On another occasion, Gibney performed tests on samples of slag sand that deviated significantly from normal ranges. When Borodkin looked at the test results and questioned Gibney, he discovered that the tests had been performed incorrectly. The tests had to be re-run.

On March 4, 2011, Borodkin issued a written work deficiency warning to Gibney for failing to follow standard procedures and specifications. Borodkin had assigned Gibney the task of developing, blending, testing, and completing a Category 5 mix design. He directed her to make it as cheap as possible and discussed proposed aggregates to include in the mix. Gibney complained to Borodkin that she was not privy to any of the prices of the aggregates, and he told her that she would figure it out. When Gibney informed Borodkin that the final blend included gravel, he asked her if she realized that a Category 5 mix must be 100% crushed and cannot contain gravel. Gibney responded that she read that specification, but thought they could "get away with it." (Gibney Dep., Ex. 11, ECF No. 24-5 at 44.) Gibney admitted in her deposition that she was not careful enough in the details of the process, but maintains that the process was supposed to be trial and error, and that her actions did not warrant a written warning. She also submits that gravel can be crushed, and that she does not know why she said "get away with it" when she responded to Borodkin's questioning. The written warning Borodkin issued advised that "[k]nowingly disregarding mix design specifications is unacceptable performance for a Certified Technician with five years of experience." (*Id.*)

On March 16, 2011, Gibney received a performance evaluation. She was rated as having good written and verbal communication skills, but the balance of the categories were designated

---

Accordingly, the fact is undisputed for purposes of the motion for summary judgment. *See* Fed. R. Civ. P. 56(c)(1) and (e).

as either needing improvement or unsatisfactory. In conjunction with this review, Rieth-Riley presented Gibney with a Performance Improvement Plan (PIP). It set forth specific goals and objectives for Gibney, which she believed were attainable. However, one week after receiving the PIP, Gibney quit her employment with Rieth-Riley. She scheduled post-resignation meetings with Dennis Hanna, Rieth-Riley's Human Resources Manager, and another Rieth-Riley employee to discuss the work environment and to register a complaint. On April 25, Gibney wrote a letter to the EEOC District Office in Indianapolis to register a claim for a hostile work environment.

**C.     Stacey Rhoads's Employment**

1.     Rhoads's Hiring

Rhoads began working as a QC Tech in Rieth-Riley's Elkhart lab on January 26, 2009. Rhoads was the sole QC Tech in the Elkhart lab. She reported to Don Halverson, who was the Quality Manager. After she was hired, Rhoads asked Halverson if she could leave work early two to three times per week so she could pick her son up from day care. Although the arrangement was not put in writing, Rhoads was permitted to leave early.

2.     Rhoads's Complaint to Human Resources

In November 2009, Borodkin became Rhoads's supervisor. On October 27, 2010, Rhoads met with Hanna, as the Director of Human Resources, to complain about Borodkin's conduct during his first year as her supervisor. First, she complained that when Borodkin became her

supervisor and she apprised him of the arrangement she had with Halverson to leave early to pick her son up, Borodkin would not agree to the arrangement, responding that, "you reap what you sow." Rhoads then spoke to Borodkin's supervisor, Berscheit, who convinced Borodkin to allow Rhoads to continue the arrangement. Second, she complained that, in reference to a vacuum cleaner hose that had melted when it was placed next to a heater, Borodkin stated to Rhoads, "you don't need to have a college degree to figure out not to put the shop vac hose by something hot," even though she was not the one who melted the hose. (Rhoad's Dep. Ex. 8, ECF No. 24-3 at 31.) This was in June 2010. Rhoads also complained that when Borodkin asked her to work later in October 2010 because of an increased workload in the Elkhart lab, she reminded him of her need to leave early to take care of her son. Borodkin responded, "your life choices will affect your career" and told Rhoads that she "needed a husband" or to "get back with your son's father." He also told her on another occasion that if she chose her son first, her career would suffer. Her final complaint was that Borodkin had not invited her to a party at the South Bend lab for interns returning to school.

In response to these complaints, Hanna conducted an investigation and summarized the outcome in a letter written to Rhoads on November 12. Hanna stated that Borodkin would cease making statements regarding Rhoads's martial status or family life, noting that he was advised that such statements were not acceptable and that future statements could result in disciplinary action. Hanna further stated that Borodkin would treat Rhoads with the same level of respect that he would a male employee in her position. Lastly, Hanna noted that neither Borodkin nor Rieth-Riley would retaliate in any adverse manner for Rhoads coming forward with the complaint, and that Rhoads would notify the Directory of Human Resources immediately of any such

retaliation. Rhoads and Borodkin both signed the letter to indicate their agreement with its contents. A copy of the letter was placed in Borodkin's personnel file. He was also required to attend a coaching/counseling program to enhance his ability to interact with and manage employees.

3.      Complaints of Retaliation

a.      *Time Sheets*

Chris Weinkauf is the Area Manager for Rieth-Riley's South Bend and Elkhart facilities. On November 8, 2010, which was eleven days after Rhoads spoke to Hanna about Borodkin, Weinkauf was arriving at the Elkhart property at the same time that Rhoads arrived. He later saw her time sheet and noticed that her stated arrival time did not match the time he saw her arrive. Borodkin and Weinkauf met with Rhoads to discuss the discrepancy, but she was not disciplined in any way.

That same day, Rhoads sent an email to Berscheit to advise him that Weinkauf and Borodkin had accused her of lying about her hours. She denied being dishonest, and indicated that she would start sending out emails when she arrived and before she left as proof of her hours so that she could not again be accused of lying. She indicated in the email that she "guessed this sort of thing would start happening," and wanted to inform Berscheit of her solution to protect herself. (Rhoad's Dep. Ex. 9.)

b.      *Borodkin's Comment*

Rhoads maintains that despite the directive that Borodkin cease making statement about her marital status or family life, that Borodkin told Rhoads that she would be able to work longer

if she did not have to care for her child. She did not report the comment to Hanna.

c.   *Performance Evaluations*

Borodkin gave Rhoads two performance reviews during her employment. The first, completed on December 18, 2009, evaluated Rhoads's performance in 2009. The second, which evaluated her performance in 2010, was completed in February 2011, four months after Rhoads complained to Hanna about Borodkin. Rhoads complains that the second performance review was retaliatory.

The first evaluation contained the evaluator's comments under five categories of assessment: (1) things done well the past year; (2) things needing improvement; (3) progress from goals established last year; (4) goals for upcoming year; and (5) issues requiring immediate attention of employee. (Rhoads Dep. Ex. 13.) In the 2009 review, Borodkin described the items needing improvement as follows: "Stacey needs to analyze test results on the matter of 'making sense' for given circumstances." (*Id.*) He also stated that she needed "improvement in her degree of communication with QC manager. Finally, he stated she "needs to develop proactive behavioral pattern on permanent basis regardless of location or activity at given time." (*Id.*) In the category documenting things done well, Borodkin wrote that Rhoads was conscientious, willing to work, motivated, and showed an ability to learn job skills at a fairly quick rate. He stated that, as a first year employee, she demonstrated openness to receive advice and correction, and was able to perform necessary QC activities related to hot mix asphalt production and partial mix design development during 2009.

The second evaluation was completed on a different form, which required the evaluator

13

to select a rating of outstanding, very good, good, needs improvement, or unsatisfactory for twelve different categories of performance. Borodkin selected "needs improvement" for eight of the categories, and "unsatisfactory" for one. He left one category unmarked and selected "good" for the remaining two categories—knowledge of job category, and adherence to company policies. In the comment section for work results, he noted that Rhoads needed "improvement in test results analysis on the matter of 'making sense' for given circumstances." (Rhoads Dep. Ex. 14.) For the business ethics category, he noted that she still needed "improvement in her degree of communication with QC manager on all the matters." (*Id.*) He also repeated the language from the 2009 evaluation regarding the need to develop a "proactive behavioral pattern" under the category of working relationships, which considered the employee's willingness to work with and help others, ability to accept constructive criticism and to cooperate with employees and supervisors. The other categories where Borodkin indicated that Rhoads needed improvement related to problem solving, decision making, initiative, and creativity. Rhoads believes that she complained to someone in Human Resources about the evaluation, but she does not remember who she complained to and there is no record of her complaint. Rhoads does not identify the substance of her complaint.

After the 2010 review, Rhoads received the same 2.7% pay increase that most other employees received.

4.    Rhoads's EEOC Charge

On March 4, 2011, one month after her performance review, Rhoads mailed a Charge of Discrimination to the EEOC, which was filed on March 18, 2011. She alleged that Borodkin had

14

subjected to her discrimination based on her sex and retaliated against her. Following the

Charge, Rhoads complained to Human Resources about Borodkin's behavior two more times.

On March 23, 2011, she sent an email to Hanna regarding communication issues she was having

with Borodkin. She believed it was appropriate for her to have email communication with

Borodkin, and complained that he yelled at her for emailing him and told her that all

communication had to be in person. Hanna and another manager met with Rhoads on two

occasions to discuss how Rhoads and Borodkin were expected to communicate with each other

in the lab.

On April 7, Rhoads sent an email to Hanna to inform him that Borodkin had not included

her when he took the male technicians to lunch in South Bend.


5.      Rhoads's Resignation

On Monday, April 11, 2011, Rhoads sent an email to Borodkin asking if she could have

time off to attend a dental appointment the following Thursday. She suggested that, because she

was not sure if she had any time left, that she be allowed to come in at 7:30 and leave at 2:30 and

take a loss of an hour for the day. The appointment was a follow-up to a previous dental

appointment for which Borodkin had given Rhoads time off. Borodkin responded by email that

evening and told Rhoads that she needed supervisory approval for time off and that they would

"talk about it in more detail when I come back from Indianapolis." (Rhoads Dep. Ex. 5.) The

next morning, Rhoads resigned via an email she sent to Hanna. Rhoads stated that she had come

to the decision that she could no longer work for Rieth-Riley, citing constant bullying and

discrimination, Borodkin's making it clear that he would not approve her request for time off for

the dental appointment, and the fact that a close friend died over the weekend and she thought it

would be futile given Borodkin's treatment of her request to attend a dental appointment to

request time off to attend the funeral. At the time she sent her email, Borodkin had not denied

her time off for her dental appointment.

Rhoads considered Borodkin's physical presence at work to be very intimidating. He did

not touch her, but would get "as close to [her] personal space as possible." (Rhoads Dep. 59.)

According to Rhoads's deposition testimony, she did not complain to Human Resources about

everything she considered retaliatory because Berscheit, who had been helpful to her, was

moved from her department after her first complaint to Human Resources in October 2010.[3] She

also believed that, since Rieth-Riley was not enforcing its "zero tolerance" policy against

Borodkin, but was giving him a second chance, that Human Resources was not going to do

anything to help her. (Rhoads Dep. 107–08.) By this time, Rhoads was taking medication for

anxiety, which she had attributed to her work situation.

## ANALYSIS

### A.    Hostile Work Environment

An employer violates Title VII if it is responsible for a hostile work environment. *Harris

v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993);*Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421,

426 (7th Cir. 2004). "'Title VII affords employees the right to work in an environment free from

discriminatory intimidation, ridicule, and insult.'" *Johnson v. City of Fort Wayne*, 91 F.3d 922,

---

[3] It is unclear whether Rhoads believes that Berscheit's move was a response to her complaint, but there is absolutely no evidence that the two events were related.

938 (7th Cir. 1996) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)).

"[C]onduct demonstrating 'anti-female animus' can support a hostile work environment claim."

*Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009) (citing *Boumehdi v. Plastag*

*Holdings, Inc.*, 489 F.3d 781, 788 (7th Cir. 2007)). However, to survive summary judgment on a

hostile work environment claim, a plaintiff must show the following: "(1) her work environment

was both objectively and subjectively offensive; (2) the harassment complained of was based on

her gender; (3) the conduct was either severe or pervasive; and (4) there is a basis for employer

liability." *Scruggs*, 587 F.3d at 840 (citing *Dear v. Shinseki*, 578 F.3d 605, 611 (7th Cir. 2009)).

To establish a constructive discharge, the working conditions must be even more

egregious than the high standard for hostile work environment. *Patton v. Keystone RV Co.*, 455

F.3d 812, 818 (7th Cir. 2006) (citing *McPherson v. City of Waukegan*, 379 F.3d 430, 434, 440

(7th Cir. 2004)).

> An employee can assert a claim of constructive discharge when she is forced to
> resign because her working conditions, from the standpoint of the reasonable
> employee, had become unbearable. *Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th
> Cir. 1998). Absent extraordinary conditions, "a complaining employee is expected
> to remain on the job while seeking redress." *Perry v. Harris Chernin, Inc.*, 126 F.3d
> 1010, 1015 (7th Cir. 1997). As courts have noted, "'[a]n employee who quits without
> giving his employer a reasonable chance to work out a problem has not been
> constructively discharged.'" *Ulichny v. Merton Comm. Sch. Dist.*, 249 F.3d 686, 704
> n.16 (quoting *Yearous v. Niobrara County Mem'l Hosp.*, 128 F.3d 1351, 1356 (10th
> Cir. 1997)) (internal citations omitted).

*Grube v. Lau Indus., Inc.*, 257 F.3d 723, 728 (7th Cir. 2001). "Case law illustrates that an

employee has not acted reasonably if she assumes the employer will fail to protect her without

allowing the employer a chance to try." *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 429

(7th Cir. 2004) (citing *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir. 1996)).

Additionally, "failure to object to egregious conditions, or to seek some form of redress is

compelling evidence that the employee, or any reasonable worker, would not find the conditions intolerable." *Wolf v. Nw. Ind. Symphony Soc'y*, 250 F.3d 1136, 1143 (7th Cir. 2001) (citing *Lindale*, 145 F.3d at 955).

Here, the Plaintiffs cannot meet the elements of a hostile work environment claim, much less established the more demanding standard for constructive discharge. Accordingly, and for the reasons set forth in detail below, the Defendant is entitled to judgment as a matter of law.

1.      Plaintiff Gibney

"To rise to the level of a hostile work environment, conduct must be sufficiently severe or pervasive to alter the conditions of employment such that it creates an abusive working environment" *Scruggs*, 587 F.3d at 840 (citing *Ezell v. Potter*, 400 F.3d 1041, 1047 (7th Cir. 2005)). "The environment must be both subjectively and objectively offensive." *Id.* (citing *Rogers v. City of Chi.*, 320 F.3d 748, 752 (7th Cir. 2003)).  "An objectively hostile environment is one that a reasonable person would find hostile or abusive." *Adusumilli v. City of Chi.*, 164 F.3d 353, 361 (7th Cir. 1998) (citing *Harris*, 510 U.S. at 21). In evaluating whether a workplace is hostile, a court must look at the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Harris*, 510 U.S. at 23. The conditions Gibney worked under while Borodkin acted as her supervisor between late 2009 and March 2011 simply do not meet this standard.

In her submissions to the Court, Gibney designates very little evidence in support of this claim. In her deposition testimony, she asserted generally that the atmosphere changed after Pyle

and Erickson were hired as QC Techs. Her specific claims are that two or three times Borodkin took the male employees to lunch without her, that Borodkin would invite the other male employees into the yard or the back room for conversations that she was not asked to participate in, and that Borodkin told her that he did not think women should work, but needed to stay home and have babies. She also contends that he made disparaging remarks to her as she entered test data for an Excel spreadsheet, and that he did not talk to the male Techs in this same manner.

Gibney's arguments in support of allowing a jury to consider whether she was subject to sexual harassment suggest that for the second element—that the harassment was based on her gender—it is enough that she is a women and her supervisor and the other QC Techs were men. This is not the law. Gibney must present some evidence to show that Borodkin's treatment of her was based on her gender and not personal reasons: the law does not simply assume gender animus is the guiding principle in people's actions. The "complained of conduct must have . . . a sexual . . . character or purpose to support a Title VII claim." *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345–46 (7th Cir. 1999) (citing *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1308 (7th Cir. 1989)) (although a woman had a door closed in her face, was startled by being approached without warning, was cut off in parking lot, and subjected to abusive language such as "get your head out of your ass," and "what the hell are you doing?" "these events cannot be seen as having racial or gender overtones, and nothing suggests they were motivated by discrimination.") For example, nothing about the comments that Borodkin made to Gibney while she entered test data in the computer suggest that they were motivated by the fact that she is a woman. *See, e.g., Vance v. Ball State Univ.*, 646 F.3d 461, 470 (7th Cir. 2011) (stating that the unkind or aggressive conduct of a supervisor was not motivated by race because it had no racial

character or purpose to it); *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 863–64 (7th Cir. 2005) (holding that because the harassment of which the plaintiff complained "could just as readily have been perpetrated upon a white person without any alteration in its character or purpose," the court could not "reasonably construe [the employer's] actions as being motivated by hostility to [the plaintiff's] race"); *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 302–03 (7th Cir. 2004) (rejecting the plaintiff's suggestion that the problems he experienced at work were racially based because white supervisors did not have the same problems where he did not show any connection between these occurrences and his race). Comments such as "you didn't do that right," "what are you doing," "how come you did that," have absolutely no gender-derogatory character or purpose to them , and Gibney has not otherwise connected them to her gender. *Cf. Passananti v. Cook Cnty.*, 689 F.3d 655, 666 (7th Cir. 2012) (rejecting "the idea that a female plaintiff who has been subjected to repeated and hostile use of the word 'bitch' must produce evidence beyond the word itself to allow a jury to infer that its use was derogatory towards women [because] [t]he word is gender-specific"). Gibney's "problems were not related to [her gender]—they were related to [her]. The fact that [s]he is a member of a protected class does not transform them." *Herron*, 388 F.3d at 303.

Gibney also asks the Court to infer that Borodkin's failure to invite her to lunch on two to three occasions and the fact that he did not involve her in certain conversations was gender related. There is no basis for this inference. Gibney does not point to any evidence from which a factfinder could infer that Borodkin treated her the way he did, at least in part, because she is a woman. Even on summary judgment the Court does not draw inferences "that are supported by only speculation or conjecture." *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012)

20

(quotations marks omitted).

The one gender-specific comment Gibney has identified was Borodkin's expression of his belief that women should stay home and have babies. However, the only comment of this nature she specifically identified in her submissions was made in the context of a discussion between co-workers about religious views, which Gibney admits she did not consider harassing. Isolated comments "do not rise to the level of conduct that alters the terms and conditions of employment." *Passananti*, 689 F.3d at 667 (citing *Adusumilli*, 164 F.3d at 361); *Scruggs*, 587 F.3d at 841. Even if the Court assumes that Bodorkin made an additional comment during the time he supervised her, the isolated comment is not sufficiently severe to support a hostile work environment claim. *See Baron v. Winthrop Univ. Hosp.*, 211 F. App'x 16, 17 (2nd Cir. 2006) (finding that supervisor's comments that "women should not be in health care," "females should not be making any decisions," and "[all females] should have their tubes tied," were not sufficiently severe or pervasive to alter the terms and conditions of employee's employment, so as to constitute a hostile work environment in violation of Title VII); *Hartsell v. Duplex Prod., Inc.*, 123 F.3d 766, 772 (4th Cir. 1997) (holding that the following comments were not actionable under Title VII: "We've made every female in this office cry like a baby;" "mini van driving mommy;" "be a salesperson and play with the big boys;" "go home and fetch [her] husband's slippers like a good little wife"); *Bermudez v. City of N.Y.C.*, 783 F. Supp. 2d 560, 602 (S.D.N.Y. 2011) (finding that supervisor's statement to female police officer that women should "stay at home" to make babies" and other comments regarding women's proper role in society were insufficient to support a claim of a hostile work environment); *Lenihan v. Boeing Co.*, 994 F.Supp. 776, 791–93 (S.D. Tex. 1998) (finding that co-workers' comments that "women should

21

stay at home or that it's a good thing for them to be at home" were insufficient to support a claim of a hostile work environment). In fact, nothing Borodkin is alleged to have done because of Gibney's gender, taken individually or as a whole, can be viewed as threatening or humiliating, much less frequent enough to have unreasonably interfered with her work performance. There is no evidence that any of the conversations Gibney was excluded from were necessary to her job or otherwise hindered her ability to perform her job. Without any context for the conversations, there is no basis to infer that being excluded from them altered the terms or conditions of Gibney's employment. The exclusions from lunch invitations likewise did not occur frequently, did not constitute hostile or abusive action, and did not expose her to disadvantageous terms or conditions of employment.

In response to the Defendant's Motion for Summary Judgment, Gibney alleges that "the complaints in this case are not limited to the comments made by [Borodkin]; the Plaintiffs allege a work environment that included almost daily humiliation, berating and intimidation by [Borodkin]." (Pls.' Brief xviii.) Gibney faults the Defendant for wanting the Court "to focus on only the comments and specific instances, and not the testimony that [Borodkin]'s behavior was not limited to sporadic events." (*Id.* xix.) It is Gibney's request, however, that overreaches. "At summary judgment, . . . saying so doesn't make it so; summary judgment may only be defeated by pointing to admissible evidence in the summary judgment record that creates a genuine issue of material fact," *U.S. v. 5443 Suffield TeRieth-Rileyace, Skokie, Ill*., 607 F.3d 504, 510 (7th Cir. 2010), and Gibney's assertion about the frequency of Borodkin's actions are not supported by any citation to admissible evidence, nor to any specific instances identifying the times, places, or context of such humiliating or intimidating conduct. These "[b]are allegations not supported by

specific facts are insufficient in opposing a motion for summary judgment." *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989) (citing *Anderson*, 477 U.S. at 248; *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), *cert. denied*, 464 U.S. 960 (1983)); *see also Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 726 (7th Cir. 2004) (noting that the court could not consider the plaintiff's conclusion that employees in his protected group were treated more harshly, asked to do certain work more often, and written up for reasons that employees outside the protected group were not because he did not set forth any times, dates, or places that led to and supported his conclusions); *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) ("Conclusory allegations, unsupported by specific facts, will not suffice" to show a genuine dispute for trial). Gibney has failed to present evidence from which a reasonable finder of fact could conclude that she suffered harassment based on her gender that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.

Gibney's claim that she was constructively discharged is a nonstarter because "[c]reation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case." *Pa. State Police v. Suders*, 542 U.S. 129, 149 (2004). For the sake of completeness, however, the Court finds that Gibney's situation was far from the extreme situation warranting a resignation as the only alternative to avoiding or overcoming an intolerable situation. In cases finding constructive discharge, the plaintiffs suffered from much more severe and sustained harassment than the conduct identified by Gibney. In *Taylor v. Western & Southern Life Insurance Co.*, 966 F.2d 1188, 1191 (7th Cir. 1992), the court found constructive discharge when the plaintiffs' boss constantly peppered the plaintiffs with racist comments, brandished a pistol and held it to one plaintiff's head. In *Brooms v. Regal Tube Co.*,

23

881 F.2d 412, 417, 423 (7th Cir. 1989), the plaintiff established constructive discharge where "repeated instances of grossly offensive conduct and commentary" culminated with an incident during which a co-worker showed the plaintiff a racist pornographic photograph, told her that she was hired to perform the task depicted in the photograph, grabbed the plaintiff and threatened to kill her.  In *Porter v. Erie Foods, International, Inc.*, 576 F.3d 629, 640 (7th Cir. 2009), the court held that a claim for constructive discharge was possible where the harassment included repeated use of a noose and implied threats of physical violence. In *Patton v. Keystone RV Co.*, 455 F.3d 812, 818 (7th Cir. 2006), the court found that a reasonable jury could conclude that the plaintiff should have quit to immediately protect herself where the jury could find that the plaintiff's supervisor "was an obsessed man who—based on previous acts showing no regard for [the plaintiff]'s right to control who could touch intimate areas of her body—was capable of, and desirous of, physically assaulting her in a serious way." As these cases show "serious physical harm to one's body is illustrative of one general circumstance meeting [the] higher standard for harassment. When it becomes reasonable to fear serious physical harm, it becomes reasonable to quit immediately rather than seek redress while on the job." *Patton*, 455 F.3d at 818. Gibney has not pointed to any circumstances that suggest it was reasonable for her to believe that she could not remain employed while seeking redress.

Gibney's failure to avail herself of the complaint procedures further undermines her claim that her conditions were intolerable. Gibney acknowledges that she did not use Rieth-Riley's complaint procedure to complain about Borodkin's behavior, but claims that her "her failure to exercise those remedies was informed by the lack of effectiveness of Ms. Rhoads' utilization of these procedures and their ineffectiveness at changing the intimidating and

24

harassing culture towards women that existed at Rieth-Riley under Oleg Borodkin." (Pls.' Brief xxi.) Gibney has not provided any evidentiary basis in support of her statement that she had information about the complaints lodged by Rhoads, or Rieth-Riley's response to those complaints. Gibney cannot be heard to argue that resignation was her only option when she quit without giving her employer a reasonable chance to work out any problems she was having with Borodkin.

2.      Plaintiff Rhoads

In support of her claim that she was subject to a hostile work environment, Rhoads asks that the Court consider the "daily nature of the intimidation and harassment engaged in by [Borodkin]." (Pls.' Brief xvii.) However, this assertion about the frequency of Borodkin's actions is not supported by any citation to admissible evidence that identifies specific instances of such conduct. Rhoads does not attempt to identify the times, places, or context of the alleged daily harassment. Her conclusory allegation is insufficient to oppose a summary judgment motion. *See Lucas*, 367 F.3d at 726; *Payne*, 337 F.3d at 773; *Schroeder*, 875 F.2d at 620. The Court will consider only the actions and comments of Borodkin that Rhoads specifically identifies and supports by citations to admissible evidence in the record.

Looking at all of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interfered with Rhoads's work performance, the Court finds that the conduct is not one that a reasonable person would find hostile and abusive. Over the course of a year, Borodkin commented three times about Rhoads's single parent status and its

25

impact on her career, told her you don't need a college degree to figure out not to put a shop vac hose next to something hot, and failed to invite her to a work gathering. Rhoads maintains that, even after Borodkin was counseled against making such comments, he told her on one additional occasion that she would be able to work longer hours if she did not have to care for her child. He also yelled at her for using email to communicate with him, and failed to include her when he took the male technicians to lunch in South Bend.

Only the comments about her child rearing responsibilities have any gender overtones. There is no evidence that Borodkin's failure to include Rhoads in social activities at work were attributable to Rhoads's gender. The comment about the shop vac hose could have just as easily been said to a male employee without any alteration in the statement's character or purpose. There is nothing about the statement or the context in which it was said to indicate that it was directed at Rhoads because she is a woman. Similarly, Borodkin's response to Rhoads's method of communicating with him could have just as likely been meant as an expression of acrimony over a work-related dispute rather than an intent to harass her because she is a woman. Even if Borodkin's actions were motivated by anti-female animus, they are not actionable because a reasonable person would not consider them sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. The conduct, which was not particularly demeaning, humiliating, or vulgar, was sporadic, non-threatening, and non-physical. The isolated comments and the failure to include her in a party and a lunch did not unreasonably interfere with Rhoads's ability to perform her QC Tech job responsibilities. The most potentially personally invasive action, encroaching on her personal space, is submitted without any detail as to the nature of the invasion, the circumstances, or the frequency. There is

26

no evidence upon which to conclude that it was pervasive or was objectively intimidating or threatening. Summary judgment is the moment in litigation where the non-moving party is required to marshal and present the court with the evidence upon which a reasonable jury could rely to find in her favor. *See AA Sales & Assocs., Inc. v. Coni-Seal, Inc.*, 550 F.3d 605, 613 (7th Cir. 2008). Rhoads has failed to marshal and present such evidence. Even though Rhoads has presented evidence that she sought medical treatment for anxiety and considered Borodkin's presence to be intimidating, this evidence establishes only that she subjectively perceived his conduct to be harassing, not that her perception was objectively reasonable.

Because Rhoads has failed to put forth evidence from which a reasonable jury could find that she was subject to sexually hostile work environment, she does not come close to painting a picture of the egregiously hostile work environment required to support a claim for constructive discharge. *See Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 650 (7th Cir. 2011) (holding that because establishing a constructive discharge claim is more difficult than establishing a hostile work environment "[t]he failure of the latter thus dooms the former.") Moreover, as the cases cited by the Court above demonstrate, Rhoads was not faced with the kind of circumstances that would warrant immediate removal from the environment. The Defendant is entitled to judgment as a matter of law on Plaintiff Rhoads's harassment claim.


**B.**     **Discrimination Based on Sex**

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" on the basis the individual's sex. 42 U.S.C. §

2000e-2(a)(1). A plaintiff may prove her discrimination case under the direct method or indirect method of proof. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). The Court will, as both the Defendant and the Plaintiffs have done in their summary judgment briefs, analyze the Plaintiffs' claims under the indirect burden-shifting method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under this method, which provides a means of evaluating indirect evidence of discrimination at the summary judgment stage, *Oest v. Ill. Dept. of Corrs.*, 240 F.3d 605, 612 (7th Cir. 2001), each Plaintiff must first establish a prima facie case of discrimination by showing that: "(1) she is a member of a protected class, (2) her job performance met [the employer's] legitimate expectations, (3) she suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff," *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 750–51 (7th Cir. 2006). If the prima facie case is established, it triggers a presumption of discrimination and the burden then shifts "to the employer to articulate some legitimate, nondiscriminatory reason" for its action. *McDonnell Douglas*, 411 U.S. at 802; *Burks*, 464 F.3d at 751. When the employer does so, the burden shifts back to the plaintiff, who must present evidence that the stated reason is a "pretext," which in turn permits an inference of unlawful discrimination. *McDonnell Douglas*, 411 U.S. at 804; *Burks*, 464 F.3d at 751.

There is no dispute that the Plaintiffs, as women, are members of a protected class. The Defendant argues that neither Plaintiff, however, can satisfy all the other elements of a prima facie case of discrimination. The Court agrees.

First, the Plaintiffs cannot satisfy the adverse employment action prong of a prima facie case of discrimination. Title VII's prohibition against discrimination with respect to terms,

conditions, or privileges of employment reaches only "material, sufficiently important alterations of the employment relationship (often referred to as 'adverse employment actions')"). *Brewer v. Bd. of Trs. of Univ. of Ill.*, 479 F.3d 908, 916–17 (7th Cir. 2007) (citing *Minor v. Centocor, Inc.*, 457 F.3d 632, 634 (7th Cir. 2006)). "A cognizable adverse employment action is a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Chaudhry v. Nucor Steel-Ind.*, 546 F.3d 832, 838 (7th Cir. 2008) (quoting *Bell v. EPA*, 232 F.3d 546, 555 (7th Cir. 2000)). The "purpose of the adverse employment action requirement is to provide a reasonable limiting principle for the type of conduct actionable under the statute." *Phelan v. Cook Cnty.*, 463 F.3d 773, 780 (7th Cir. 2006); *see also Hunt v. City of Markham, Ill.*, 219 F.3d 649, 653 (7th Cir. 2000) ("The idea behind requiring proof of an adverse employment action is simply that a statute which forbids *employment* discrimination is not intended to reach every bigoted act or gesture that a worker might encounter in the workplace.").

In *Herrnreiter v. Chicago Housing Authority*, 315 F.3d 742, 744–45 (7th Cir. 2002), the Seventh Circuit identified three categories of cases (including a variant of the second category designated as 2a) that provide the requisite act of discrimination to support a Title VII claim. *Id.* The first category of cases are those where the employee's compensation, fringe benefits, or other financial terms of employment are diminished, such as occurs in a termination of employment. *Id.* at 744. The Plaintiffs do not attempt to show that Rieth-Riley diminished their compensation, fringe benefits, or other financial terms of employment. Nor could they, based upon the record in this case, because their negative performance evaluations, warnings, and placement on a PIP did not result "'in tangible job consequences and therefore are not adverse

employment actions actionable under Title VII.'" *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 648

(7th Cir. 2005) (quoting *Longstreet v. Ill. Dep't of Corrs.*, 276 F.3d 379, 384 (7th Cir. 2002)).

Second are cases in which "a nominally lateral transfer with no change in financial terms

significantly reduces the employee's career prospects by preventing him from using the skills in

which he is trained and experienced, so that the skills are likely to atrophy and his career is likely

to be stunted." *Herrnreiter*, 315 F.3d at 744. A variation of this occurs when an employee is not

actually transferred, but his job is nonetheless "changed" in a way that "injures his career." *Id.*

The Plaintiffs were not transferred to a position that significantly reduced their career

prospects by preventing them from using the skills in which they were trained and experienced,

thus exposing them to future financial harm. In fact, they were both given substantial

responsibilities in their respective labs.

In support of their discrimination claim, the Plaintiffs rely on the third category of

adverse employment action identified in *Herrnreiter*. This category applies when the conditions

in which an employee works are changed in a way that subjects her to a "humiliating, degrading,

unsafe, unhealthful, or otherwise significantly negative alteration in her workplace

environment—an alteration that can fairly be characterized as objectively creating a hardship,

the classic case being that of the employee whose desk is moved into a closet." *Herrnreiter*, 315

F.3d at 744. This category also includes "cases of constructive discharge" and "cases of

harassment—mistreatment of an employee by coworkers or supervisors that is sufficiently severe

to worsen substantially his conditions of employment as they would be perceived by a

reasonable person in the position of the employee." *Id.* at 745. The Plaintiffs argue that they

suffered an adverse employment action when they were subject to a "culture of harassment" that

was so severe that they were "constructively discharged." (Pls.' Brief xxii, ECF No. 28.)

As the Court concluded above, the Plaintiffs have not presented evidence from which a reasonably trier of fact could conclude that they were subjected to mistreatment that was sufficiently severe to worsen substantially the conditions of their employment as those conditions would be perceived by a reasonable person in their positions. They have not shown that the "working environment was so intolerable that resignation was a fitting response." *Bannon v. Univ. of Chi.*, 503 F.3d 623, 629 (7th Cir. 2007). This failure to identify an adverse employment action is alone sufficient to grant summary judgment in favor of the Defendant. *See Traylor v. Brown*, 295 F.3d 783, 790 (7th Cir. 2002) (noting that where a plaintiff fails to make a sufficient showing on an essential element of her case, the moving party is entitled to judgment as a matter of law even if the plaintiff has established all of the other elements of a prima facie case).

Additionally, with respect to Gibney, the Defendant argues that she was not meeting her employer's legitimate employment expectations. There is substantial evidence in the record to demonstrate where Gibney fell short of Rieth-Riley's expectations. She argues that the expectations were unfair: She claims that the Defendant relied "primarily on performance evaluations completed by the person who is being charged with the harassment, Oleg Borodkin." (Pls.' Brief xxii.) She claims that the other examples provided by the Defendant are merely "pretext to protect [Rieth-Riley]." Specifically, she asserts that

> [t]he audit was ultimately the supervisor's responsibility, and Oleg himself should have been held accountable as the supervisor or at least provided a modicum of training. The other examples are primarily situations where Ms. Gibney was acting according to the training and expectations of her prior supervisor, Berscheit, while learning the tighter regulations under Borodkin.

31

(*Id.* xxii–xxiii.) Gibney concludes that she was being made the scapegoat for all of the department's problems.

"Where a plaintiff claims . . . that an employer's legitimate expectations were disparately applied, the second and fourth elements of the *prima facie* case are closely intertwined with the pretext analysis, and the two inquiries may be merged and considered together." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008). *See also Gordon v. United Airlines, Inc.*, 246 F.3d 878, 886 (7th Cir. 2001) ("As we have pointed out on several occasions, this issue of satisfactory job performance often focuses on the same circumstances as must be scrutinized with respect to the matter of pretext.") In the context of employment discrimination cases, a pretext is a dishonest explanation for the adverse employment action. *See Faas*, 532 F.3d at 642. To show that the defendant's proffered reason is pretextual, the plaintiff "must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the purported reasons that a jury could find them unworthy of credence and hence infer that [the defendant] did not act for the asserted non-discriminatory reasons." *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 541 (7th Cir. 2007) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). If the defendant honestly believed the reasons it gave, the plaintiff's effort to show pretext fails, regardless of whether that reason was "foolish, trivial or baseless." *Fane*, 480 F.3d at 541 (citing *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992)). *See also FoRieth-Rileyester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006) ("[T]he question in a discrimination case is not whether the employer's stated nondiscriminatory ground for the action of which the plaintiff is complaining is correct but whether it is the true ground of the employer's action.").

Although the Plaintiff claims that Borodkin should have provided her training before requiring her to collect the data for an INDOT audit, she does not present any evidence to suggest that Borodkin or anyone else at Rieth-Riley did not believe in good faith that such an assignment to the most senior QC Tech in the South Bend lab was appropriate. "It is not the court's concern that an employer may be wrong about its employee's performance, or may be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Coleman v. Donahoe,* 667 F.3d 835, 852 (7th Cir. 2012) (quotation marks omitted). Gibney admits that, even where she followed procedures that had been in place before Borodkin became her supervisor, she failed to follow his explicit directions to discontinue the practice. During her deposition, she stated that Borodkin undoubtedly saw her failure to accompany the geologist to the yard as insubordinate because she did not do what he asked her to do. She explained that if a geologist assures her that he knows which pile of gravel to use, and she has given him directions, she trusts her coworker to do the right thing, and reasoned that it freed her to complete other tasks. (Gibney Dep. 118.) She also admits that she told him in response to his inquiry why she included gravel in the design of a mix when the specifications explicitly prohibited gravel as an aggregate that she thought they could "get away with it." Gibney cannot show that her decision to include gravel in the mix design and her response to Borodkin were not the actual reasons that he issued a written warning with respect to her performance. Gibney has no answer for the miscommunication that led to the $18,000 INDOT fine. The fact that she did not intend the result does not suggest that Rieth-Riley did not honestly believe that she should have avoided it. Likewise, Gibney has no evidence to suggest that Rieth-Riley did not honestly believe that she needed to improve in the areas

33

addressed by the PIP. Gibney's evidence does not create a genuine dispute whether she was meeting her employer's legitimate performance expectations.

Finally, the Plaintiffs have not presented any evidence from which the Court can compare the Defendant's treatment of them to its treatment of the male QC Techs. To establish that employees not in the protected class were treated more favorably, the Plaintiffs must show that those employees were similarly situated with respect to "performance, qualifications and conduct." *Snipes v. Ill. Dep't of Corrs.*, 291 F.3d 460, 463 (7th Cir. 2002) "Such a showing normally entails establishing that 'the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Snipes*, 291 F.3d at 463 (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617–18 (7th Cir. 2000)); *see also Grayson v. O'Neill*, 308 F.3d 808, 819 (7th Cir. 2002) (to meet his burden the plaintiff must demonstrate that there is someone directly comparable to him in all material respects). The only evidence the Plaintiffs designate with respect to this element of a prima facie case is Gibney's testimony that she never heard Borodkin make a negative comment to the male Techs, "not even an, 'oh, you didn't do that right' or 'what did you do that for.' I never heard any kind of negative remark to the men." (Gibney Dep. 138–39.) This observation has no evidentiary value in light of the fact that Gibney has not pointed to any evidence indicating whether the male Techs committed the same or similar violations, failed to follow Borodkin's directions, performed below their experience level, or otherwise engaged in conduct that would have warranted a negative remark. For her part, Rhoads has made no attempt to provide a meaningful comparison between herself and the male employees with respect to

treatment that forms a requisite act of Title VII discrimination.

A genuine issue of material fact exists only where there is enough evidence that a reasonable jury could return a verdict in favor of the nonmoving party. *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012). Here, the Plaintiffs have not presented evidence from which a reasonable jury could conclude that their employer discriminated against them with respect to their compensation, terms, conditions, or privileges of employment on the basis of their sex.

### C.       Rhoads's Retaliation Claim

A plaintiff may establish unlawful retaliation using either the direct or indirect method of proof. *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009). Here, Rhoads relies on the direct method of proof and must present either direct or circumstantial evidence of: (1) engagement in a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the protected activity and the adverse action. *Barton v. Zimmer*, 662 F.3d 448, 455 (7th Cir. 2011); *Humphries v. CBOCS, Inc.*, 474 F.3d 387, 404 (7th Cir. 2007).

The Supreme Court has held that the anti-retaliation provision of Title VII "covers those (and only those) employer actions that would have been materially adverse to a reasonable employee." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). The Court further explained that "the employer's actions must be harmful to the point that this could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* However, the Court did not retreat from the long established view that "personality conflicts at work that generate antipathy and snubbing by supervisors and coworkers are not actionable,"

35

emphasizing that it remained "important to separate significant from trivial harms." *Id.* at 68 (internal quotations omitted).

Rhoads complains that she was retaliated against in violation of Title VII when Borodkin and Weinkauf accused her of being dishonest on her time sheet, and when Borodkin told Rhoads that she would be able to work longer if she did not have to care for her child, did not invite her to lunch with the male technicians, yelled at her about communicating with him by email, and gave her a poor performance evaluation. She also claims that he Borodkin's presence was intimidating because he got close to her personal space.

Commenting about Rhoads' ability to work longer hours, failing to invite her to lunch, getting upset about her method of communication, and encroaching on her personal space are petty slights that would not dissuade a reasonable worker from making a charge of discrimination. *See, e.g., Henry v. Milwaukee Cnty.*, 539 F.3d 573, 586 (7th Cir. 2008) (finding that unspecified intimidation, door slamming by superiors, missing or marked up time cards, and other incidents were petty slights and mere annoyances rather than materially adverse actions capable of sustaining a retaliation claim). Although a negative performance evaluation, if unwarranted, might dissuade a reasonable employee from making a charge of discrimination, Rhoads has not submitted any evidence that the review was inaccurate. In fact, it looked strikingly similar to the review she received before she complained about Borodkin. Title VII does not forbid sloppy, mistaken, or unfair evaluations; it forbids discriminatory or retaliatory actions. *See, e.g., Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1106 (7th Cir. 2012).

Additionally, Rhoads has not provided evidence, apart from mere speculation, that the performance evaluation's conclusion were wrong *because of* her EEOC Complaint. "'The mere

36

fact that one event preceded another does nothing to prove that the first event caused the second. . . . [O]ther circumstances must also be present which reasonably suggest that the two events are somehow related to one another.'" *Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882, 895 (7th Cir. 2001) (quoting *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000)). *See also Scaife v. Cook Cnty.*, 446 F.3d 735, 742 (7th Cir. 2006) (noting that under ordinary circumstances, "[c]lose temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment provided that there is *other* evidence that supports the inference of a causal link") (internal quotation marks omitted, emphasis added); *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002) ("[W]e remind that mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue."). This case does not involve the kind of circumstantial facts from which a jury could infer a causal link between Rhoads's complaints to Hanna or her EEOC Charge and the negative performance evaluation.

This same causal link is missing with respect to the time sheet. Rhoads is not aware of any reason that Weinkauf would retaliate against her. In fact, she thinks he was mistaken, either because he identified her car incorrectly or because his clock displayed a different time than the lab clock. (Rhoads Dep. 74–75.) She also stated in her deposition that he might have been trying to get the Elkhart office shut down because there was speculation and hearsay that he wanted to be in South Bend. (*Id.* 75–76.) Neither of these reasons suggests that Weinkauf intended to punish Rhoads for complaining about Borodkin when he accused her of misrepresenting her arrival time.

Rhoads also appears to argue that it was retaliatory for Borodkin to fail to give her time off for a dentist appointment. However, the evidence in the record is that Rhoads resigned from her employment before Borodkin made any decision pertaining to her request. Rhoads's speculation concerning what his decision may have been cannot support a claim for retaliation.

**CONCLUSION**

For the reasons stated above, the Court GRANTS the Defendant's Motion for Summary Judgment [ECF No. 23]. The Clerk will enter judgment against Plaintiffs Stacey Rhoads and Margaret Gibney and in favor of Defendant Rieth-Riley Construction Co., Inc.

SO ORDERED on March 26, 2013.

s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION